UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TIFFANEY PARACHINI**,                          Case No. 1:11 CV 1670

              Plaintiff,                          Magistrate Judge James R. Knepp II

    v.                                            MEMORANDUM OPINION AND
                                                  ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

              Defendant.

### INTRODUCTION

Plaintiff Tiffaney Parachini, on behalf of her minor child D.P., appeals the administrative denial of supplemental security income (SSI) benefits under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

Plaintiff filed an application for SSI on April 7, 2009, alleging a disability onset date of November 25, 2001. (Tr. 64–67). Her application was denied initially twice (Tr. 41, 45–51) and upon reconsideration (Tr. 42, 53–55). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 60). Born in 2000, D.P. was nine years old at the time of the application. (Tr. 64).

Medical History

D.P.'s allegedly disabling conditions are asthma, attention deficit hyperactivity disorder

(ADHD), a speech impairment, mood swings, and a learning disability. (Tr. 41, 175, 259). According to a functional assessment filled out by Plaintiff, D.P. has difficulty communicating, reading, doing many basic physical activities, getting along with others, taking care of himself, and paying attention. (Tr. 110–115, 120–124). She indicated D.P. "is very aggressive." (Tr. 115).

A field office report was completed by an SSA employee who interviewed D.P. in April 2009. (Tr. 117–119). This employee reported observing no difficulty in hearing, reading, breathing, understanding, concentrating, talking, answering, or being coherent. (Tr. 118). D.P. has had a few asthma exacerbations sometimes involving hypoventilation and vomiting. (Tr. 345, 346, 352). He has been prescribed Singulair and Pulmicort to control his asthma. (Tr. 352).

D.P. started displaying aggressive behavior in July 2006, as noted by his pediatrician who suspected ADHD. (Tr. 346, 347). Two months later, Joleen V. Sundquist, M.A., began providing regular mental health counseling for D.P. (Tr. 311). At her initial evaluation of D.P., Sundquist noted behavioral issues including aggression towards his parents and peers, but also reported D.P. struggles with loneliness and anxiety. (Tr. 313). Sundquist suspected D.P. has a form autism or Asperger's. (Tr. 297). Throughout the time Sundquist counseled D.P., D.P. was on medication for ADHD, though sometimes did not take it as prescribed. (Tr. 312–320). For instance, in October 2006, Sundquist remarked, "[D.P.] did not have medication this a.m. and was clearly hyper – running through halls, standing on . . . chairs in waiting room." (Tr. 314). Similarly, in November 2006, Sunquist reported D.P. had been without his ADHD medication for a week and in that time received a detention resulting from his hyper behavior. (Tr. 319).

Sundquist's records are replete with observations of "behavior congruent with a diagnosis of ADHD" (Tr. 141), such as "[D.P.] needed numerous prompts to stay on task[,] behaving as if he

2

didn't know answers" (Tr. 317). Sundquist also deduced early on, in December 2006, that D.P.'s reading and math skills are delayed. (Tr. 318). She referred D.P. to pediatric psychiatrist Jayant Choure, M.D. (Tr. 268). Plaintiff then took D.P. to Dr. Choure in March 2007 with complaints of impulsivity, aggression, and hyperactivity. (Tr. 268). D.P. denied any thoughts of hurting himself or others. (Tr. 268). Dr. Choure noted poor insight and judgment, and reported a delay in D.P.'s speech development. (Tr. 269). Dr. Choure diagnosed ADHD, combined type. (Tr. 270). He prescribed Aderall XR, and D.P. immediately showed improvement in his behavior at school. (Tr. 273).

D.P. continued to be seen by Dr. Choure routinely over the course of several years. However, Plaintiff frequently failed to bring D.P. to scheduled appointments with Dr. Choure (Tr. 360, 367, 369, 371, 373, 379, 384, 391), one time prompting Dr. Choure's nurse to counsel her on the importance of keeping regular visits so D.P.'s vital signs could be closely monitored while on medication (Tr. 361). Dr. Choure's office staff also once documented a profane confrontation with Plaintiff following an incident where Plaintiff sent a friend to pick up D.P.'s prescriptions but the friend was unable to spell or pronounce his name. (Tr. 389–390). Nonetheless, the treatment relationship continued.

In August 2007, Plaintiff called Dr. Choure's office to report mood swings and a "really bad episode" D.P. had where he grabbed a knife and stabbed a chair. (Tr. 275). As it turned out, Plaintiff admitted she had not been giving D.P. his medication every day as prescribed, but instead was frequently skipping days. (Tr. 275). Nonetheless, Dr. Choure changed D.P.'s medication to Concerta, advising Plaintiff about the importance of compliance. (Tr. 277). At a follow-up, Dr. Choure reported D.P. had been "doing very well", with no complaints from his school teachers, on

3

Concerta. (Tr. 278). Similarly, in October and November 2007, Plaintiff reported D.P. was doing really well. (Tr. 280, 282). Dr. Choure continued D.P. on Concerta in early 2008, noting no side effect problems and continued reports of good sleeping, eating, and improvement at school. (Tr. 286, 288). D.P. had also been attending counseling. (Tr. 278, 282, 288).

In April 2008, Plaintiff began reporting an increase in hyperactivity again. (Tr. 291). There were also reports from D.P.'s school teacher that he had been not focusing well in class. Dr. Choure then increased D.P.'s dosage of Concerta and recommended continued counseling. (Tr. 291). In November of that year, Plaintiff complained to Dr. Choure that D.P. had been "not doing well" in school, was impulsive, and had difficulty falling asleep. (Tr. 386). However, Plaintiff admitted to Dr. Choure that she had not yet started D.P. on Clonidine, his then-recently prescribed ADHD medication. (Tr. 386, 393). Several times in 2009, Plaintiff brought D.P. back to Dr. Choure complaining of increased frustration, distraction, aggression, impulsivity, or otherwise worsening behavior, and each time Dr. Choure increased D.P.'s dosage of Clonidine. (Tr. 359, 378, 381).

In December 2009, Plaintiff told Dr. Choure D.P. was "not doing well at home", was stealing things, and was having "a lot of anger outbursts". (Tr. 398). This had been going on since October. (Tr. 400). In response, Dr. Choure added Risperdal to D.P.'s medication regimen. (Tr. 398). The following month, Plaintiff reported to Dr. Choure that D.P. was sleeping and eating well, doing okay in school, and having some improvement in anger outbursts since starting on Risperdal. (Tr. 397). D.P. himself reported being happy, but at one appointment Dr. Choure noted he was "a little fidgety because he [had] not take[n] his [C]lonidine medication yet." (Tr. 397). Four months later, Dr. Choure noted D.P. was "doing okay" and had improved grades at school with no complaints from teachers. (Tr. 395).

4

Since Plaintiff filed for SSI, D.P. has undergone various consultative evaluations. In October 2008, consultant James T. Liang, M.D., conducted an examination of D.P. (Tr. 296–298). He noted a history of asthma hospitalizations, and made normal physical findings. (Tr. 297–298). Dr. Liang said this of D.P.'s functional capacities: "The child was noted to be an alert and cooperative child with delayed speech and normal gross motor and fine motor skills. He interacted well with the examiner. His behavior was appropriate for his age." (Tr. 298).

In January 2009, D.P. underwent a speech and language development evaluation by consultant Paula McCabe, M.A.. (Tr. 300–302). McCabe noted D.P. answered her questions in a timely manner and did not need any prompts to remain focused. (Tr. 301). She reported moderate receptive and expressive language delays. (Tr. 301). Despite some articulation difficulty, McCabe reported D.P. was intelligible in conversation 80–100% of the time. (Tr. 302). She also reported D.P.'s voice, fluency, oral structure and functioning, and hearing to be within functional limits. (Tr. 302). In conclusion, she determined D.P.'s moderate language delays "may make it difficult for [D.P.] to ask and answer questions, initiate and maintain conversations, provide detailed personal narratives[,] and fully participate in the general education curriculum." (Tr. 302).

In May 2009, consultant Silvia Vasquez, M.D., oversaw a review of D.P.'s medical history and conducted a disability evaluation. (Tr. 321–327). Dr. Vasquez listed ADHD, aggressive behavior, language disorder, asthma, oppositional defiant disorder (ODD), and learning disorder as D.P.'s impairments. (Tr. 322). She determined D.P.'s combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings. (Tr. 322). She assessed each of the relevant domains of functioning, noting D.P. has less than marked restrictions in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for

5

himself, and health and physicial well-being, with no limitation in the domain of moving about and manipulating objects. (Tr. 324–325). In explaining her findings, Dr. Vasquez noted teacher reports indicate "there is a significant difference on the days [D.P.] takes his medication to the days he doesn't." (Tr. 327).

In September 2009, while Plaintiff's SSI application was under reconsideration, another consultative evaluation was undertaken by Malika Haque, M.D. (Tr. 332–337). Dr. Haque agreed that D.P.'s impairments do not meet or equal a listing. (Tr. 332). In concurring about a less than marked limitation in attending and completing tasks, Dr. Haque also relied on teacher reports of significant improvement in class work while on medication. (Tr. 334). Dr. Haque found no marked limitations in any domain of functioning. (Tr. 334–335).

The record contains a plethora of documentation from individuals at D.P.'s school. In May 2007, an evaluation team report was completed by school personnel including an occupational therapist, a speech therapist, the school psychologist, nurse, and principal, one of D.P.'s teachers, and D.P.'s case manager. (Tr. 97–106). Nurse Janet Wiese, who conducted a vision screening and health review, noted a history of asthma and ADHD. (Tr. 98). D.P.'s speech therapist, Ann Serzynski, reported D.P. "continues to exhibit significant difficulty with his articulation, listening comprehension, and oral expression." (Tr. 99). However, she said D.P. "has recently become more attentive []most likely due to a change in medication[.]" (Tr. 99). She noted a relative strength in grammatical understanding and a relative weakness in sentence imitation. (Tr. 455). Nancy Baker, who tested D.P.'s physical abilities, reported he "shows borderline fine motor skills – below average [b]ut not significantly low." (Tr. 100).

The school psychologist who contributed to the evaluation team report, April Tapper,

evaluated D.P. and observed difficulty maintaining attention to classroom tasks. (Tr. 101). She characterized D.P. as a "happy and well-adjusted child" who has difficulties with articulation and writing words. (Tr. 101). "Overall", Tapper wrote, "it is very obvious that [D.P.] has difficulty staying in his seat, staying on task, and demonstrating beginning writing skills needed to write a sentence." (Tr. 102). Tapper noted an evaluation filled out by one of D.P.'s teachers, which said D.P. almost always disrupts other children, has reading problems, is easily distracted, and has trouble staying seated. (Tr. 102).

Tapper determined D.P.'s "cognitive abilities are in the [b]orderline to [a]verage ranges." (Tr. 104). Test results showed D.P. has borderline verbal comprehension, average perceptual reasoning and processing speed, and low average working memory. (Tr. 103). Other tests showed D.P. to be borderline in spelling and written expression, and low average in numerical operations and math reasoning. (Tr. 104). In summary, as of May 2007, D.P. was said to be demonstrating preschool to beginning kindergarten skills instead of end of kindergarten skills. (Tr. 104). The evaluation team concluded D.P. has a specific, language-based learning disability. (Tr. 106).

A progress report from June 2008 – the summer before he started second grade – noted D.P. "[c]ontinues to make slow gains in his speech and language skills." (Tr. 163). D.P.'s second grade individualized education program (IEP) indicated that he was reading 30 words per minute when he should have been reading 90 words per minute. (Tr. 152). That school year, D.P. scored in the seventh national percentile in reading. (Tr. 257). He scored in the below average range for all subjects tested. (Tr. 257).

D.P.'s second grade special education teacher, Bonita Tarantina, reported him being one and a half years below grade level in written language skills and one year below grade level in reading.

7

(Tr. 88). She filled out a questionnaire in August 2008 (Tr. 87–96) in which she stated D.P. has serious problems in reading and comprehending written material, expressing ideas in written form, learning new material, and recalling and applying previously learned material. (Tr. 88). Tarantina said D.P. needs extra time to complete assignments. (Tr. 89). Importantly, Tarantina reported no problems in the domains of interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 90–92).

In April 2009, Tarantina and Kristen Osborne, D.P.'s second grade language and writing teacher, filled out another questionnaire. (Tr. 130–137). At that time, D.P.'s reading and written language abilities were assessed to be at the first grade level, though his math ability was said to be at the second grade level. (Tr. 130). Also, D.P.'s speech therapist suggested he may need speech therapy throughout elementary school, noting his speech is difficult to understand and "his skills are not age appropriate." (Tr. 172).  Tarantina and Osborne indicated serious or very serious problems in many areas, and noted D.P. is unable to write a sentence. (Tr. 131–133). Importantly, they said when D.P. "takes his medication for ADHD, he is more focused and work is better. When he doesn't take it (which seems to be about 2 days a week), he is very agitated, unsettled, and unfocused." (Tr. 132). When asked how D.P.'s functioning changes after taking his ADHD medication, the teachers responded, "He is more controlled and focused. . . . There is significant difference on the days when [D.P.] gets his medicine compared to the days he doesn't." (Tr. 136). They stated D.P. cannot be trusted to take his medication. (Tr. 135).

In May 2009, D.P.'s special education teacher reported he makes "[v]ery slow progress in reading and writing" but is "[f]ine in math." (Tr. 184). She said he "does irritate other students when he hasn't had his ADHD medication[,] which is frequently." (Tr. 185). D.P.'s second grade report

8

card comprises mainly "basic" ratings, indicating he "[a]pproaches the grade level standards" in almost every subject, with a few grades showing him to be "proficient", "consistently meet[ing] grade level standards". (Tr. 126). D.P. was labeled satisfactory in most learner qualities other than demonstrating organizational skills. (Tr. 127). A lot of unfinished work was found in D.P.'s desk, though; his second grade teacher said he has trouble getting his work done and turned in. (Tr. 127).

D.P.'s third grade report card shows he received almost all Cs and Ds for the first quarter of the academic year. (Tr. 213). His teacher commented that he needs to "show more responsibility for bringing back homework" and assignments. (Tr. 214). His grades did not change much through the remainder of third grade, with his teacher still indicating he was struggling and falling behind. (Tr. 468, 469). D.P.'s third grade teacher reported D.P. works below grade level in science and social studies, and needs small group interventions for all subjects. (Tr. 249). She also said D.P. gets off task easily and constantly needs to be redirected. (Tr. 249). Observation of D.P. during third grade showed him to be off-task 80% of the time, compared to his peers who are off-task only 10% of the time. (Tr. 240). D.P. reportedly had difficulty completing his school work independently "unless verbally prompted by the classroom teacher and with one-on-one support with following written directions." (Tr. 240).

A questionnaire filled out by Tarantina in April 2010 reports D.P. "[s]eems to get along well with peers and is respectful to adults." (Tr. 217). "The only problem we've had this year", wrote Tarantina, "is getting homework turned in." (Tr. 217). However, the report also indicated D.P. has "significant speech articulation and structure problems." (Tr. 217). A note on D.P.'s third grade report card indicated "his progress has been slow" in correcting his speech difficulties. (Tr. 221). At that time, D.P. was reading at "a level F on the Fountas and Pinell Scales", which is at the first

grade level. (Tr. 222).

Evaluative tests were conducted by the school psychologist in January 2010. (Tr. 245). These showed D.P.'s overall reading skills to still be at the first grade level. (Tr. 245). He was "unable to comprehend second and third grade level reading material." (Tr. 245). D.P.'s writing skills were assessed to also be at the first grade level, and his math skills were determined to be mid-second grade level. (Tr. 245–246). His full scale IQ was shown to be 77, within the borderline range and seven points lower than his IQ two years earlier. (Tr. 241). His verbal reasoning abilities were also in the borderline range, and significantly lower than the other index areas. (Tr. 241). D.P. fell within the average range in perceptual reasoning, low average range in processing speed, and extremely low range in working memory. (Tr. 241).

D.P.'s fourth grade IEP indicated he does not have "behavior which impedes [his] learning or the learning of others". (Tr. 405). It also reported D.P. "has a very difficult time focusing and remaining quietly on task" that "increases as the day goes on". (Tr. 405). He was noted to still be at a beginning first grade reading level (Tr. 406), and have difficulty writing (Tr. 407). His teachers also said he struggles with math and new concepts (Tr. 408), and displays a delay in his grammatical skills (Tr. 410). D.P. "has made progress", the IEP concluded, although continued speech services were still recommended. (Tr. 405). According to his teachers, D.P. still needs small group interventions for all subjects. (Tr. 441).

Administrative Hearing

Plaintiff appeared with counsel at a video hearing before the ALJ on May 4, 2010. (Tr. 31). She testified briefly about her son's educational and behavioral difficulties. Plaintiff said D.P. has been in special education since his second year of kindergarten. (Tr. 35). Regarding D.P.'s

behavioral problems, Plaintiff testified he does "a little bit of hitting and kicking and arguing with other students". (Tr. 36). Teachers have to repeat instructions to him, and he cannot sit still at his desk. (Tr. 36). Plaintiff said D.P. one time got in trouble for throwing rocks at cars at the bus stop. (Tr. 37). At home, Plaintiff said D.P. needs "total one-on-one" with his homework, and would not be able to complete it without Plaintiff's help. (Tr. 38–39). D.P. also has trouble concentrating at home; Plaintiff testified even video games do not hold D.P.'s attention anymore. (Tr. 39).

Plaintiff also discussed D.P.'s medical issues. She said D.P. is treated for ADHD and mood swings. (Tr. 37–38). He sees a counselor every two weeks. (Tr. 38). Plaintiff testified whenever he misses a counseling appointment, "you can tell a difference in his mood and his attitude". (Tr. 38). Plaintiff has been prescribed medications for his ADHD, mood swings, and sleeping problems. (Tr. 39).

The Commissioner's Decision

The ALJ issued an unfavorable decision on July 19, 2010. (Tr. 8–24). In his decision, the ALJ found D.P. has the severe impairments of ADHD, oppositional defiant disorder (ODD), a language disorder, asthma, and a learning disability, but concluded that none of these, singularly or combined, meet, medically equal, or functionally equal one of the listed impairments. (Tr. 14). To determine functional equivalence, the ALJ analyzed the records and found D.P. has less than marked limitations in every relevant functional domain. (Tr. 17–23). Plaintiff requested administrative review of this decision. (Tr. 63). The Appeals Council subsequently denied review, making the ALJ's denial the final decision of the Commissioner. (Tr. 1–3).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

11

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

1.      Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.      Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a

12

combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.   Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The six functionality domains to be assessed are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## DISCUSSION

Plaintiff now challenges the ALJ's decision arguing "substantial evidence demonstrates that there are two domains which are at a marked level of impairment, therefore, there is a functional equivalent." (Doc. 15, at 11). This argument is facially insufficient given the standard of review

applied in judicial appeals of disability determinations. That is, even if substantial evidence supports a finding contrary to the ALJ's, this Court still cannot reverse so long as substantial evidence also supports the conclusion reached by the ALJ. *See Jones*, 336 F.3d at 477. However, even construing Plaintiff's argument to be that the ALJ's findings in these two domains are unsupported by substantial evidence, it still fails for the reasons explained below.

Evidence Subsequent to the ALJ's Decision

As another initial matter, the Court notes some of the records in the transcript are dated after the date of the ALJ's decision, which was July 19, 2010. (Tr. 404–424). Defendant argues these records cannot be considered on review because they were not part of the record reviewed by the ALJ and Plaintiff has not asked for a sentence six remand.

The proper method for obtaining review of new evidence submitted to the Appeals Council is to request a sentence six remand under 42 U.S.C. § 405(g). While a claimant may, pursuant to 20 C.F.R. § 404.970(b), submit new and material evidence to the Appeals Council for its consideration, once the Appeals Council denies review, the ALJ's opinion becomes the final decision of the Commissioner. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

As other courts have noted, there is a circuit split over whether evidence submitted to the Appeals Council after the ALJ's decision should be included in the record for judicial review. *See Matthews v. Apfel*, 239 F.3d 589, 589 (3rd Cir. 2001) (citing *Perez v. Chater*, 77 F.3d 41, 45 (2nd Cir. 1996); *Wilkins v. Sec'y of HHS*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc); *Cotton v. Sullivan*, 2 F.3d 692, 695–96 (6th Cir. 1993); *Eads v. Sec'y of HHS*, 983 F.2d 815, 817–18 (7th Cir. 1993); *Nelson v. Sullivan*, 966, F.2d 363, 366 (8th Cir. 1992); *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993); *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *Falge v. Apfel*, 150 F.3d 1320,

14

1322–23 (11th Cir. 1998)). Case law in the Sixth Circuit generally requires such evidence not be considered on judicial review. *Cotton*, 2 F.3d at 695–96.

Other Circuits, however, have considered new evidence submitted to the Appeals Council to be part of the administrative record if the Appeals Council specifically incorporated it as such. *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). Here, it just so happens that the Appeals Council did exactly that. On June 11, 2011, the Appeals Council specifically incorporated into the record D.P.'s "assorted school records 2007–2011, including Individualized Education Plans, Evaluation Team Reports, report cards, and other assessments". (Tr. 5). As explained below, though, this Court finds substantial support in the record for the ALJ's decision regardless of whether this new evidence is considered or not. Therefore, the Court need not decide whether considering evidence specifically incorporated into the administrative record after the fact would run contrary to Sixth Circuit precedent. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("[E]ven if we were to consider the additional evidence as part of the record in determining whether the ALJ's decision was supported by substantial evidence, our conclusion would not change. This additional evidence does not further her cause in any significant way.").

Acquiring and Using Information

Plaintiff takes issue with the ALJ's conclusion about D.P.'s limitation in the domain of acquiring and using information. The ALJ found D.P. has a less than marked limitation in this domain. (Tr.17–18). In support of this finding, the ALJ cited D.P.'s reading and math skills, testing results, and teacher reports of improvement. (Tr. 18).

The domain of acquiring and using information addresses how well a child is able to learn

15

information and then use the information he has learned. 20 C.F.R. § 416.926a(g). The regulations

describe this domain for D.P.'s age bracket, referred to as school-age children:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

The regulations also provide some common examples of limitations in this domain, such as

not demonstrating an understanding of words about space, size, or time (e.g., in/under, big/little,

morning/night); not being able to rhyme words or the sounds in words; having difficulty recalling

important things learned in school the day before; having difficulty solving math questions or

computing arithmetic answers; or talking only in short, simple sentences and having difficulty

explaining what is meant. 20 C.F.R. § 416.926a(g)(3)(ii)–(v). Whether these examples amount to

a marked or extreme limitation depends on the totality of relevant information in the record. 20

C.F.R. § 416.926a(g)(3).

Here, a review of the evidence shows substantial support for the conclusion that D.P.'s

limitation in this domain is less than marked. That is, despite D.P.'s diagnosed learning disorder, his

reading skills are only about a year behind grade level, and his mathematical abilities did not become

deficient until his reading delay interfered with his ability to solve word problems. (Tr. 221, 224).

He was said to be "on grade level for math computation skills" in third grade. (Tr. 221).

16

Test results showed D.P.'s receptive and expressive language skills to be only moderately delayed, consistent with a less than marked limitation. (Tr. 302). D.P.'s second grade teachers indicated he was only one grade level behind in reading and writing, and not behind grade level at all in math. (Tr. 130). D.P.'s third grade IEP indicated his "listening comprehension is within low average range", even though his oral skills are "well below average". (Tr. 221). His teachers reported he "has made strong gains in his pronoun usage", but still has trouble with sentence structure. (Tr. 221). He "is able to write a sentence of 5 to 6 words with a complete thought for a given word or question", though there "are not many details in his sentences and they typically follow a pattern in which the sentence begins with 'I'." (Tr. 223). D.P. cannot "discriminate between silver coins", meaning he would have difficulty making change. (Tr. 245).

Clearly, the totality of evidence in this case shows some kind of limitation in the domain of acquiring and using information. But the fact D.P. can write complete, simple sentences (Tr. 223), can tell time by the hour (Tr. 245), can do mathematical computation at grade level (Tr. 104, 245), can verbally produce responses to sentences read to him (Tr. 243), had a full scale IQ, listening comprehension, perceptual reasoning, working memory, and processing speed all within average range at one point (Tr. 103), and was determined by professional educators to not need extended school year services (Tr. 228), shows that his restriction in this domain is not so severe as to be marked.

The medical evidence also comports with the ALJ's determination in this domain. Both consultant physician assessments indicated D.P. has less than a marked restriction in the domain of acquiring and using information. (Tr. 324, 334). Dr. Choure's records do not contradict this conclusion.

17

Furthermore, this conclusion would only be bolstered if the Court were to consider the new evidence submitted to, and incorporated by, the Appeals Council. His fourth grade IEP reported math "is a strength" for D.P. (Tr. 405). It also said he "listens and retains information read to him" and he "enjoy[s] learning". (Tr. 405). While D.P.'s speech and reading abilities cause somewhat of a restriction, the record does not show them to be so seriously deficient as to amount to a marked restriction in acquiring and using information. Therefore, the ALJ's conclusion that D.P. has less than a marked restriction in the domain of acquiring and using information is supported by substantial evidence.

<u>Attending and Completing Tasks</u>

Plaintiff also takes issue with the ALJ's determination that D.P. has a less than marked limitation in the domain of attending and completing tasks. To support this finding, the ALJ relied heavily on teacher reports and treatment notes showing significant improvement when D.P. takes his ADHD medication.

The domain of attending and completing tasks concerns how well a child is able to focus and maintain attention, and begin, carry through, and finish activities, while considering the pace and ease with which this is done. 20 C.F.R. § 416.926a(h). For D.P.'s age bracket, the regulations explain what this means:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra

18

reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

Common examples of limitations in this domain provided by the regulations are being easily distracted, startled, or over reactive to sounds, sights, movements, or touch; being slow to focus on, or failing to complete, activities of interest (e.g., games or art projects); repeatedly becoming sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks, including ones the child is capable of completing; and requiring extra supervision to keep the child engaged in an activity. 20 C.F.R. § 416.926a(h)(2)(i)–(iv). Once again, the degree of limitation depends on the totality of evidence in the record. 20 C.F.R. § 416.926a(h)(3).

With a few exceptions not relevant here, a medical condition that can be controlled or remedied by prescribed medication, treatment, or surgery is not disabling for purposes of SSI eligibility. 20 C.F.R. § 416.930; *see Brooks v. Sec'y of Health & Human Servs.*, 833 F.2d 1011 (Table), at *1 (6th Cir. 1987); *see also Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *Warford v. Bowen*, 875 F.2d 671, 673 (8th Cir. 1989). Here, the evidence shows the only times D.P. possibly has a marked limitation in attending and completing tasks are when he has not taken his prescribed ADHD medication.[1] For instance, D.P.'s second grade report card said that when D.P. "takes his medication for ADHD, he is more focused and [his] work is better. When he doesn't take it (which seems to be about 2 days a week), he is very agitated, unsettled, and unfocused." (Tr. 132). When asked how D.P.'s functioning changes after taking his ADHD medication, his teachers responded, "He is more controlled and focused. . . . There is significant difference on the days when [D.P.] gets

---

1. D.P. has been prescribed multiple medications to control his ADHD symptoms over the years, including Concerta, Clonidine, and Risperdal. (Tr. 200, 398).

19

his medicine compared to the days he doesn't." (Tr. 136). Similarly, in May 2009, Tarantina said D.P. "does irritate other students when he hasn't had his ADHD medication[,] which is frequently", but otherwise his "[b]ehavior is usually okay". (Tr. 185).

D.P.'s medical records are consistent with the evidence from D.P.'s teachers. Dr. Choure's office visit records routinely reflected increased attention and focus when taking medication as prescribed, and behavioral problems when not taking medication as prescribed. For example, in August 207, Plaintiff told Dr. Choure that D.P. had been having really bad mood swings and aggressive behavior, but admitted she had not been giving D.P. his medication every day as prescribed. (Tr. 275). Dr. Choure then prescribed Concerta, and at multiple followup appointments after D.P. had been taking Concerta as directed, he was reportedly "doing very well" with no complaints from his school teachers. (Tr. 278, 286, 288).

As another example, D.P. began "not doing well at home" with a lot of "anger outbursts" in December 2009. (Tr. 298). Dr. Choure then changed D.P.'s medication, adding Risperdal to his regimen, and the following month, D.P. was reportedly sleeping and eating well, doing okay in school, and showing improvement in his anger outbursts. (Tr. 397–398). At a subsequent appointment, Dr. Choure remarked that D.P. was happy but "a little fidgety because he [had] not take[n] his [C]lonidine medication yet." (Tr. 397).

Dr. Choure's findings are bolstered by the assessments given by consultant physicians. Dr. Vasquez determined from her review of D.P.'s records that D.P. has a less than marked restriction in the domain of attending and completing tasks. (Tr. 324). Dr. Haque later agreed with this determination, noting reports of improvement with treatment compliance from Dr. Choure, D.P.'s teachers, and D.P.'s mother. (Tr. 334). Substantial evidence definitely supports the notion that D.P.'s

20

prescribed medications control his symptoms and reduce the severity of any limitation in the domain of attending and completing tasks he may otherwise have to less than marked.

Even if the new evidence submitted to, and incorporated by, the Appeals Council were considered, this result would not change. The only evidence in this new material that relates to D.P.'s ability to attend and complete tasks is a line from his fourth grade IEP: "[D.P.] has a very difficult time focusing and remaining quietly on task. This difficulty increases as the day goes on, and he requires prompts to stay on task and to not disturb others." (Tr. 405). However, read in light of the whole report, D.P. "has made progress", "listens and retains information read to him", is "easy to please, and does enjoy learning", and "is cooperative when asked to quietly return to his work". (Tr. 405). If anything, this shows D.P.'s ability to remain attentive and focused and is not so seriously restricted as to cause a marked limitation in the domain of attending and completing tasks. Thus, the ALJ's conclusion that D.P. has a less than marked limitation in the domain of attending and completing tasks is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is affirmed.

IT IS SO ORDERED.

     s/James R. Knepp, II
United States Magistrate Judge
